**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **LEE A. LANDEZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:11-CV-00246** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Lee Landez appeals to the district court from a final decision of the

Commissioner of Social Security denying his application under the Social Security Act (the

"Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (Docket # 1.)  For

the following reasons, the Commissioner's decision will be REVERSED, and the case will be

REMANDED for further proceedings in accordance with this Opinion.

### I.  PROCEDURAL HISTORY

Landez applied for DIB in March 2007, alleging disability as of January 16, 2006. (Tr.

118-20.)  The Commissioner denied his application initially and upon reconsideration, and

Landez requested an administrative hearing. (Tr. 60-63, 68-74.)  Administrative Law Judge

("ALJ") Yvonne Stam conducted a hearing on July 22, 2009, at which Landez, who was

represented by counsel, and a vocational expert testified. (Tr. 32-57.)

On November 16, 2009, the ALJ rendered an unfavorable decision to Landez, concluding

---

[1] All parties have consented to the Magistrate Judge. (Docket # 11); *see* 28 U.S.C. § 636(c).

that he was not disabled because, despite the limitations caused by his impairments, he could perform a significant number of light work jobs in the economy. (Tr. 17-26.)  The Appeals Council denied Landez's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6, 8-11, 13, 200-17); *see* 20 C.F.R. § 404.981.

Landez filed a complaint with this Court on July 22, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.)  In this appeal, Landez alleges that a remand is warranted because the ALJ: (1) improperly evaluated the opinions of Dr. Flenar and Dr. Kniss, two treating physicians; (2) failed to consider his obesity; (3) did not minimally articulate how she arrived at the assigned RFC; and (4) improperly discounted his symptom testimony. (Docket # 20.)

## II.  FACTUAL BACKGROUND[2]

### A.  *Landez's Background*

At the time of the ALJ's decision, Landez was fifty-three years old, had obtained his GED, and possessed work experience as an assembler and welder machine operator. (Tr. 118, 160, 196.)  Landez alleges that he was disabled as a result of post-decompression laminectomy and fusion surgery of the lumbar spine, obesity, post-carpal tunnel surgery on the left, gout, and right knee degenerative arthritis. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 2.)

At the hearing, Landez, who was 5 feet 8½ inches tall and weighed 324 pounds, testified that he lives independently, but that his daughter does many of his household chores and helps him with grocery shopping. (Tr. 37, 41, 459.)  His typical day includes watching television;

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 564-page administrative record necessary to the decision.

doing stretching exercises; performing home care tasks such as preparing meals, doing laundry, and washing dishes; driving to visit his mother; and napping intermittently. (Tr. 37-41, 49-50.)

When asked why he thought he could not work, Landez stated that he gets tired after a period of walking or standing; naps two to three times a day; and has constant pain in his hips, legs, right knee, right ankle, feet, and hands. (Tr. 37.)  On a ten-point scale, he described the pain in his right knee as a "five" on a normal day and an "eight" when it "flares up"; his right foot and ankle pain as an "eight"; and his left foot pain as a "seven." (Tr. 43-45.)  Medication temporarily helps to reduce his pain by "about half." (Tr. 45.)  He thought that he could sit for fifteen to twenty minutes, stand for five to ten minutes, and carry a gallon of milk. (Tr. 42.)  Landez also testified that his left hand goes numb at times and that he has hand tremors. (Tr. 45-47.)  In addition, he alleged that he has difficulty concentrating due to his pain. (Tr. 43.)

*B.  Summary of the Relevant Medical Evidence*

Landez sustained a back injury on the job in October 2005 and received treatment at Parkview Occupational Center. (Tr. 224-55, 449.)  In December 2005, Dr. G. Kniss opined that Landez could return to work with the following modified duties: lift no more than fifteen pounds; minimize bending, reaching, squatting, twisting, or climbing; and alternate between sitting and standing as needed. (Tr. 231.)

In January 2006, Landez visited Dr. Kevin Rahn, an orthopaedic surgeon, for his back pain. (Tr. 449.)  After obtaining x-rays, an MRI, and a CAT scan, he diagnosed Landez with L5-S1 spondylolisthesis with lysis and degenerative disk disease and dehydration at L3-4, 4-5, and 5-1. (Tr. 446, 448.)  Dr. Rahn did not recommend that Landez undergo surgery unless conservative management failed. (Tr. 446.)

In January 2006, Landez saw Dr. Rex Flenar, his general practitioner, for his back pain. (Tr. 459.)  Dr. Flenar noted tenderness from the L3 and L4 area of the lumbar spine and in the right paraspinous muscles; Landez had pain upon straight leg raising. (Tr. 459.)  Dr. Flenar diagnosed Landez with low back pain and spondylolisthesis of the low back and assigned the following restrictions: no lifting greater than fifteen pounds, minimal bending and twisting, and an option that allowed him to frequently alternate between sitting and standing. (Tr. 459.)  The next month, Landez told Dr. Flenar that he was a "little bit" better and that Dr. Rahn had agreed with the restrictions placed upon him. (Tr. 458.)  He rated his pain as a "four" or "five"; he stated that Darvocet really helped reduce the pain but made him extremely drowsy. (Tr. 458.)

In April 2006, Landez told Dr. Rahn that he had been working out at the YMCA but that his low back pain was worsening. (Tr. 444.)  Dr. Rahn referred him for physical therapy and to Dr. David Stensland, a physiatrist. (Tr. 444.)  Landez visited Dr. Flenar that same month, reporting that he was taking Darvocet intermittently. (Tr. 457.)  He had tenderness over his low back but a straight leg raising test was negative. (Tr. 457.)  Dr. Flenar recommended that Landez continue exercising and attend Weight Watchers. (Tr. 457.)

In May 2006, Landez saw Dr. Stensland. (Tr. 440.)  He had tenderness to palpitation in the low back; lumbar extension and lateral bending aggravated his pain, but a straight leg raising test was negative. (Tr. 438.)  Dr. Stensland diagnosed Landez with lumbar spondylosis L4-5 and more mild at L3-4, and spondylolisthesis secondary to pars fracture at L5-S1; he ordered a spinal injection. (Tr. 436-37.)  The following month, Dr. Stensland ordered a second injection, noting that the first injection was not helpful. (Tr. 432.)  In July, Landez told Dr. Stensland that the second injection provided him with significant relief for several days, but then the pain returned.

(Tr. 427.)  His pain was exacerbated by standing and extension-type maneuvers; he continued to take Darvocet. (Tr. 427.)  Dr. Stensland scheduled another injection and restricted Landez from bending, twisting, stretching, or lifting over fifteen pounds. (Tr. 426.)

In August 2006, Landez reported some improvement to Dr. Stensland. (Tr. 422.)  He continued Landez's medications and restrictions and referred him to physical therapy and to Dr. Rahn for re-evaluation. (Tr. 422.)  Landez also saw Dr. Flenar that month; he was taking water exercise classes at the YMCA and had lost eleven pounds. (Tr. 456.)  He had some mild pain upon straight leg raising and reported some fatigue. (Tr. 422.)

In September, Landez returned to Dr. Stensland, reporting that his pain was a "five" or "six." (Tr. 418.)  He had completed physical therapy; his mobility had improved but his back pain persisted. (Tr. 418.)  He thought that his pain was still significant enough to consider surgical intervention. (Tr. 418.)  The following month, Dr. Stensland concluded that Landez had failed conservative treatment and referred him to Dr. Rahn for a surgical evaluation. (Tr. 413.)

Landez visited Dr. Rahn in November 2006, and Dr. Rahn ordered x-rays, which showed significant spondylolisthesis, and a discogram. (Tr. 405, 409.)  Dr. Stensland performed the discogram, which indicated that the primary pain generator was the L5-S1 disk level and secondary pain generators were likely L3-4 and L4-5. (Tr. 398-402.)  Dr. Stensland's impression was that surgical fixation would not be required to address Landez's pain. (Tr. 402.)  Later that month, however, Dr. Rahn recommended that Landez undergo an interbody fusion and instrumentation. (Tr. 395-96.)

In December 2006, Landez returned to Dr. Stensland, rating his pain between a "four" and an "eight." (Tr. 393.)  He was taking Tylenol during the day and Darvocet at night. (Tr.

393.)  Landez decided he wanted to proceed with surgery. (Tr. 392.)  Due to his various health issues, Dr. Rahn referred him back to Dr. Flenar to obtain a clearance for surgery. (Tr. 395, 456.)  Later that month, Dr. Rahn performed a decompression laminectomy, L5-S1; anterior interbody fusion, right L5-S1; anterior interbody spacer, L5-S1; posterolateral bone grafting, L5-S1; instrumentation nonsegmental titanium, L5-S1; and anterior local bone graft. (Tr. 282.)

In January 2007, four weeks after surgery, Landez told Dr. Rahn that he was doing well. (Tr. 387, 389.)  His pain was much better in his legs and back, although he was still using a walker. (Tr. 387.)  He started water therapy the next month, and Dr. Rahn restricted him to lifting five pounds. (Tr. 385.)  Landez returned in March, and x-rays looked "fairly solid as far as fixation" and the fusion "was occurring nicely." (Tr. 380.)  Dr. Rahn noted that Landez was "still requiring restrictions as far as getting around" and that he would likely have some permanent restrictions. (Tr. 380.)  By April, Landez was doing very well from a clinical standpoint; although he was still using a cane, he had much less pain than before surgery. (Tr. 377.)  Dr. Rahn assigned him a permanent restriction of lifting no more than fifteen pounds. (Tr. 377.)

On May 12, 2007, Landez underwent a consultative examination by Dr. Milan Za. (Tr. 359-62.)  On examination, Landez weighed 280 pounds; he used a cane and demonstrated a shuffling gait. (Tr. 360.)  He had mild difficulty getting on and off the exam table and in and out of a chair. (Tr. 360.)  Dr. Za noted some paraspinal tenderness, and range of motion in the lumbar region was somewhat limited; a straight leg raising test was positive. (Tr. 360.)  Muscle strength, range of motion, and sensation of his extremities were normal. (Tr. 360.)

On May 25, 2007, Dr. R. Fife, a state agency physician, reviewed Landez's record and opined that he could lift and carry ten pounds occasionally and twenty pounds frequently; stand

or walk about six hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; but never climb ladders, ropes, or scaffolds. (Tr. 366-67.)  His opinion was later affirmed by a second state agency physician. (Tr. 473.)

In June 2007, Dr. Flenar examined Landez and articulated that he could not lift more than fifteen pounds, perform repetitive bending or twisting, or sit or stand for more than an hour and a half. (Tr. 471.)  In September, Dr. Flenar penned a letter stating that Landez could not sit or stand for more than two hours at a time, perform repetitive gripping with his hands due to carpal tunnel syndrome, or work around fumes or dust; and that Landez's orthopaedic surgeon had restricted him to lifting only ten pounds occasionally. (Tr. 475.)  He also indicated that Landez had an essential tremor and thus had unsteady hands for doing work requiring fine motor skills. (Tr. 475.)

In November 2007, Landez consulted Dr. Flenar about his chronic, intermittent neck and back pain, which he rated as a "four" or "five." (Tr. 487.)  Landez had pain in his hip and down his left leg when walking, which caused him to limp. (Tr. 487.)  He had a moderate intention tremor and tenderness in his neck and spinal paraspinous muscles; a straight leg raising test caused pain on the left. (Tr. 487.)  He had weakness in his grip bilaterally and some subjective decreased sensation to fine touch in his fingers. (Tr. 487.)  Dr. Flenar increased his Neurontin. (Tr. 487.)

The following month, Landez, who weighed in at 315 pounds, told Dr. Flenar that the Neurontin was helping with his back pain and that his hands and ankles felt less swollen. (Tr. 386.)  He had tenderness in the right paraspinous muscles, a positive straight leg raising test on

the right, weakness in his grip bilaterally, decreased sensation to fine touch in both hands, and an intention tremor. (Tr. 486.)  He still walked with a limp. (Tr. 486.)  In February 2008, Landez told Dr. Flenar that his back was "the same." (Tr. 485.)  He had tenderness in the right paraspinal muscles and a positive straight leg raise test on the right. (Tr. 485.)  Dr. Flenar observed a mild to moderate intention tremor, which was absent at rest; he continued to limp when he walked. (Tr. 485.)  Dr. Flenar started Landez on Cymbalta. (Tr. 485.)

In March 2008, Landez told Dr. Flenar that his back was about the same and that he did not take the Cymbalta because he was afraid of potential side effects. (Tr. 484.)  The next month, Landez weighed 322 pounds and complained of pain and swelling in his hands, wrists, ankles, and knees. (Tr. 483.)  He also had intermittent soreness in his neck and felt a little short of breath at times. (Tr. 483.)  He continued to have a marked intention tremor, but stated that it did not significantly bother him. (Tr. 483.)  He had some mild tenderness in his paraspinal muscles, wrists, hands, elbows, and knee; his range of motion was normal. (Tr. 483.)  An x-ray of his right knee showed slight degenerative changes. (Tr. 541.)  Dr. Flenar diagnosed him with multifocal arthritic discomfort with swelling in the joints; hypertension; adjustment disorder with depression, stable; chronic lumbago; and essential tremor. (Tr. 483.)

In May 2008, Landez complained of pain, swelling, and tenderness in his right knee, ankle, and other joints; his back symptoms were about the same, and he limped at times. (Tr. 482.)  The next month, Landez complained of right wrist pain, tenderness, and swelling. (Tr. 481.)  Dr. Flenar thought that it was probably gout and adjusted Landez's medication. (Tr. 481.)

In August, Landez told Dr. Flenar that his pain was about the same but that the swelling in his knees had diminished; he did, however, have mild swelling in his ankles. (Tr. 480.)  In

8

October, he complained of having headaches two to three times a week; otherwise, his aches and pains were about the same. (Tr. 521.)  In January 2009, Landez weighed in at 334 pounds. (Tr. 520.)  He reported to Dr. Flenar that he had been doing fairly well and that his arthritic pain was adequately controlled; he did not have swelling in his feet or ankles. (Tr. 520.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

# IV. ANALYSIS

## A. The Law

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[3] *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, with respect to steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it

---

[3] Before performing steps four and five, the ALJ must determine the claimant's RFC, that is, what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On November 16, 2009, the ALJ rendered her decision. (Tr. 17-26.)  She found at step one of the five-step analysis that Landez had not engaged in substantial gainful activity after his alleged onset date and at step two that he had the following severe impairments: degenerative disk disease, lumbar spine; chronic neck pain; left carpal tunnel syndrome, status-post surgery; degenerative joint disease, right knee; diabetes; and essential tremors. (Tr. 19.)  At step three, the ALJ determined that Landez's impairment or combination of impairments was not severe enough to meet or equal a listing. (Tr. 19.)

Before proceeding to step four, the ALJ assigned Landez the following RFC:

> [T]he claimant has the residual functional capacity to perform light work . . . except claimant is limited to lifting and carrying a maximum of 15 pounds occasionally and 10 pounds frequently.  He can stand and walk about six hours in combination and sit about six hours of an eight-hour workday.  He can never climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl.

(Tr. 20.)  Based on this RFC and the vocational expert's testimony, the ALJ found at step four that Landez was unable to perform his past relevant work. (Tr. 25.)  The ALJ found at step five, however, that Landez could perform a significant number of other unskilled light jobs within the economy, including security guard; usher, lobby attendant, and ticket taker; and restaurant, lounge, or lobby host. (Tr. 26.)  Therefore, Landez's claim for DIB was denied. (Tr. 26.)

## C. The ALJ's Discounting of Dr. Flenar's Opinion About Landez's Standing and Sitting Limitations Is Not Supported by Substantial Evidence

Landez argues, among other things, that the ALJ improperly discounted the opinion of Dr. Flenar, his treating family practitioner, indicating that he was unable to sit or stand for more

than an hour and a half. (Tr. 24, 471.) For the following reasons, Landez's argument has merit.

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. § 404.1527(c)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. § 404.1527(c)(2).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(c); *see Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). The Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. § 404.1527(c)(2).

Here, the ALJ acknowledged the various treating source opinions of record. In that regard, he noted the opinion of Dr. Kniss, who treated Landez in late 2005—several years before his back surgery—and instructed him to lift no more than fifteen pounds; minimize bending,

reaching, squatting, twisting, or climbing; and alternate between sitting and standing as needed. (Tr. 24.)  The ALJ also discussed the opinion of Dr. Rahn, his treating orthopaedic surgeon who performed Landez's back surgery and in March 2007 assigned him a permanent restriction of lifting no more than fifteen pounds. (Tr. 24.)  In addition, the ALJ considered the July 2007 opinion of Dr. Flenar, his family practitioner, indicating that Landez was unable to lift more than ten pounds, perform repetitive bending or twisting, or sit or stand for more than an hour and a half. (Tr. 24.)

Ultimately, however, the ALJ rejected the opinions of Dr. Flenar and Dr. Kniss about Landez's limitations in standing and sitting.  With respect to Dr. Flenar, the ALJ noted that Dr. Flenar had said he was basing his opinion pertaining to Landez's lifting ability on Dr. Rahn's restriction. (Tr. 24.)  The ALJ then reasoned that "to the extent that [Dr. Flenar's] restrictions are greater they are not well supported by the evidence." (Tr. 24.)  Thus, the ALJ discounted Dr. Flenar's opinion about Landez's limited sitting or standing capacity because she thought it was inconsistent with Dr. Rahn's opinion assigning only a lifting limitation, which, she apparently concluded, equated to *no* limitation on standing, walking, or sitting. (*See* Resp. Br. 5-6.)

Upon closer examination, however, the restriction on Landez's ability to sit or stand penned by Dr. Flenar, or, for that matter, Dr. Kniss, is *not* inconsistent with Dr. Rahn's opinion of Landez's limitations.  To explain, Dr. Rahn treated Landez for his spinal condition; there is no indication, however, that he evaluated or treated Landez for any of his other ailments, such as right knee degenerative arthritis, gout, obesity, or foot, ankle, and knee pain and swelling.

On that front, prior to performing Landez's surgery, Dr. Rahn sought a medical clearance from Dr. Flenar, stating:

> We need to get clearance from his family doctor, as far as surgery. He does not look the healthiest in the world, in regards to *he has had some other injuries, issues, as far as equilibrium issues and some balance issues*, but I think he otherwise systemically, heart, lung or kidney problems, he is fairly healthy. We will get a check up from his family doctor as well, on this.

(Tr. 395 (emphasis added).) Then, when assigning the fifteen-pound lifting restriction in March and April 2007, Dr. Rahn opined that Landez's "[r]estrictions are 15 pounds *from [his] standpoint*." (Tr. 380 (emphasis added); *see also* Tr. 377.) He further observed, however, that Landez "still uses a cane to get around" (Tr. 377) and "*is still requiring restrictions as far as getting around*" (Tr. 380 (emphasis added); *see also* Tr. 360 (noting that Landez had a "shuffling gait and used a cane")). Thus, Dr. Rahn seemingly contemplated that Landez's other treating physicians may indeed assign him additional restrictions, such as with respect to his mobility. Consequently, the Court is not convinced that Dr. Rahn's opinion is inherently inconsistent with Dr. Flenar's opinion about Landez's standing or sitting limitations.[4]

Moreover, as Landez emphasizes, the ALJ made *no* mention of his height (5 feet 8½ inches), weight (324 pounds), or obesity in her decision. "An ALJ must factor in obesity when determining the aggregate impact of an applicant's impairments." *Arnett v. Astrue*, — F.3d —, 2012 WL 1071707, at *6 (7th Cir. Apr. 2, 2012) (citing *Martinez v. Astrue*, 630 F.3d 693, 698-99 (7th Cir. 2011); *Clifford*, 227 F.3d at 873). As the Commissioner argues, "[t]his error could

---

[4] As to Dr. Kniss, he also opined that Landez had limitations in his ability to sit or stand and thus restricted him to work that afforded a sit-to-stand option. The ALJ, however, never explained why she rejected Dr. Kniss's opinion. The Court presumes it is because the opinion was rendered in 2005, before Landez underwent surgery and before his alleged onset date. The Court, however, should not be forced to speculate about the ALJ's reasoning—an ALJ must minimally articulate her reasoning so that a court can perform a meaningful review. *Briscoe ex rel Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."); *Williams v. Bowen*, 664 F. Supp. 1200, 1207 (N.D. Ill. 1987) ("No court should be forced to engage in speculation as to the reasons for an ALJ's decision.").

conceivably be harmless if the ALJ indirectly took obesity into account by adopting limitations suggested by physicians who were aware of and discussed [the claimant's] obesity." *Id.* (citing *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).

The Commissioner contends that the ALJ's error is harmless here because "the ALJ adopted the findings of one of Landez's physicians who was aware of his obesity, Dr. Rahn." (Resp. Br. 4 ("Dr. Rahn knew that Landez was 5'9" and 300 pounds, but nonetheless opined that he could work with no more than a restriction from lifting over 15 pounds.").)  But, to reiterate, the Court has no assurance that Dr. Rahn contemplated the combined effects of Landez's various ailments when he assigned only a lifting restriction.  In fact, as discussed *supra*, his notes suggest just the opposite—that he thought Landez might have additional restrictions due to his other conditions, including limited mobility. (*See* Tr. 377, 380.)

As the vocational expert pointed out at the hearing, the three jobs identified and relied upon by the ALJ were defined as "light" work "because of the need to be on your feet" up to six hours during an eight-hour workday. (Tr. 54.)  Here, in light of her error in failing to expressly consider Landez's obesity, the ALJ's wholesale rejection of Dr. Flenar's and Dr. Kniss's opinions about Landez's prolonged standing or sitting limitations and her adoption of Dr. Rahn's silence on the subject, leaves the Court without assurance that the ALJ's conclusion is adequately supported.[5]

---

[5] Although, as the Commissioner emphasizes, the RFC assigned by the ALJ tracks the opinion of the state agency physicians, the ALJ never mentioned these opinions in her decision.  Of course, "the Commissioner's decision must stand or fall with the reasons set[] forth in the ALJ's decision." *Mirza v. Barnhart*, No. 00 C 8003, 2002 WL 731781, at *7 (N.D. Ill. Apr. 25, 2002); *see Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. Nov. 7, 2011) ("We have made clear that what matters are the reasons articulated *by the ALJ*." (emphasis in original)).

In any event, the state agency physicians either ignored or did not review Dr. Flenar's opinion.  They

Consequently, it is most prudent to remand this case to the Commissioner for further evaluation of the medical source opinions of record with respect to Landez's standing, walking, and sitting limitations when considering the combination of his impairments. Of course, if the ALJ is uncertain about the scope of Dr. Rahn's restrictions, she may contact him to request additional clarification. *Skarbek*, 390 F.3d at 504 (stating that an ALJ must recontact medical sources "when the evidence received is inadequate to determine whether the claimant is disabled"); SSR 96–5p, 1996 WL 374183, at *6.

## V. CONCLUSION

For these reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion. The Clerk is directed to enter a judgment in favor of Landez and against the Commissioner.

SO ORDERED.

Enter for this 23rd day of April, 2012.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

indicated that Dr. Rahn's opinion warranted "controlling weight" and that no other treating or examining medical source offered conclusions about Landez's limitations that were significantly different from their own findings. (Tr. 371.)